UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

YOLANDA LARRY,

                    Plaintiff,                        Case Number 14-14172

v.                                          Honorable David M. Lawson

THERESA POWERSKI,

                    Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Yolanda Larry was fired from her job as a patient representative at Flint, Michigan's Hurley Medical Center. The hospital said it terminated Larry for improperly accessing patient medical records in violation of its policy under the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, 110 Stat. 1936, (HIPAA). The plaintiff says those accusations were trumped up by her immediate supervisor, Theresa Powerski, who was retaliating against her as a result of the bad blood between them, which resulted from, among other things, Larry contacting the Michigan Department of Civil Rights and lodging a complaint that Powerski (and therefore Hurley) was discriminating against her on account of her race.

In the first round of litigation, Larry sued Hurley Medical Center in state court, alleging claims of (1) wrongful discharge absent good cause, in breach of her employment contract; (2) violation of the Michigan Whistleblower Protection Act; and (3) retaliatory discharge, contrary to Michigan's Elliott-Larsen Civil Rights Act. She took her case to trial and a jury awarded her damages, including back and front pay, of more than $180,000. The present case is round two. Larry now brings claims against Powerski individually based on the same facts but advancing

variant legal theories: (1) tortious interference with contractual relations (count I); (2) injurious falsehood (count II); (3) denial of procedural due process via 42 U.S.C. § 1983 (count III); and (4) First Amendment retaliation (count IV). Defendant Powerski has moved for summary judgment, arguing, among other things, that the state court judgment precludes the present lawsuit. The plaintiff has filed her own motion for partial summary judgment, contending that the undisputed facts entitle her to a judgment as a matter of law on her procedural due process claim.

Although the legal theories in the state and federal lawsuits are not identical, the plaintiff's claims of tortious interference, injurious falsehood, and denial of procedural due process all are barred by the doctrine of claim preclusion, because they are premised upon the same essential facts and events underlying the plaintiff's state court wrongful termination lawsuit, and defendant Powerski, the plaintiff's supervisor, was in privity with her employer, the state court defendant hospital against whom the judgment was returned. The prior judgment does not bar the plaintiff's First Amendment retaliation claim, however, because that claim is based on a set of facts that is distinct from the state court judgment's factual foundation. Moreover, the discovery record in this case establishes fact questions requiring a trial for resolution of that claim. For these reasons, the defendant's motion for summary judgment will be granted as to counts I through III of the complaint, which will be dismissed, and denied as to count IV. The plaintiff's motion for partial summary judgment will be denied.

## I.

Plaintiff Yolanda Larry began working for the Hurley Medical Center hospital on August 2, 1993 as a clerical assistant. She worked for the hospital in various clerical and administrative positions for more than 19 years. For much of that time she was a benefits assistant in the hospital's

Human Resources department.  On May 9, 2011, Larry transitioned to a position as an Assistant Patient Representative.  The hospital's Patient Representative department handles all complaints by patients about any issues they may have with the care received while at the hospital.

Defendant Theresa Powerski was the plaintiff's supervisor at the time of the termination. Powerski admitted in her answer to the complaint that (1) Hurley Medical Center is a public corporation, (2) the defendant was employed by Hurley Medical Center during the time period relevant to the complaint, and (3) the plaintiff's employment contract gave her a protected property interest cognizable under the Due Process Clause because she only could be terminated for good cause.

During her tenure as a patient representative, the plaintiff received four performance evaluations with scores equating to "Very Good" on the hospital's employee performance rating scale. The January 3, 2012 performance evaluation resulted in an "Outstanding" performance rating.

Despite the high marks she awarded the plaintiff, Powerski also inserted a number of "counseling memos" into the plaintiff's personnel file.  That upset the plaintiff, and the memos later were removed from her personnel file after the plaintiff, Powerski, and the head of the patient representative department, Michael Burnett, met and agreed that the plaintiff needed some "reeducation" about certain aspects of her job duties.  After the meeting, Burnett requested the removal of the counseling memos, because Burnett sensed that the plaintiff believed she had been unfairly targeted by Powerski, and Burnett thought that a "fresh start" would be the best approach to improving the situation.  Burnett perceived "tension" between Powerski and the plaintiff, as a result of the two "not communicating well with each other" and not "understand[ing] each others'

motivations." Nevertheless, Powerski testified that, before August 24, 2012, the plaintiff's job "was not in jeopardy."

The hospital's policy governing the patient representative program states that, when a representative first receives a complaint, she immediately should attempt to understand and address the problem by (1) diffusing tension and listening to the patient's concerns; (2) explaining any applicable policies and procedures to the patient; (3) coordinating with nurses or doctors involved in the patient's care to better understand the problem and possible solutions; (4) mediating any disagreements or misunderstandings between the patient or family and caregivers; and (5) obtaining direction as needed from doctors or risk management personnel. If the complaint cannot be resolved informally, "at the point of origin," then the patient representative proceeds to file an internal grievance on the patient's behalf. For recording and tracking such grievances, the hospital uses an electronic database system called MIDAS.

In March 2012, the hospital began using an electronic system called EPIC to store and control access to all patient medical records. Patient representatives had "read only" access to medical records stored in EPIC, which they were allowed to view in the course of their duties for the purpose of investigating patient complaints.

On May 21, 2012, the plaintiff had a meeting with defendant Powerski and Burnett. At that meeting, Burnett told the plaintiff that Powerski had reported to him that the plaintiff had been having inappropriate discussions with coworkers about salaries paid to managers at the hospital. The plaintiff denied that she had any such conversations, and she told Burnett that she believed Powerski was discriminating against her because of her race (African-American). Also in May 2012, the plaintiff told William Smith (presumably another employee of the hospital in an

-4-

unspecified position) that Powerski had told the plaintiff that she was hired "to handle the African American population." Later, the plaintiff also told Vanessa Nelson (apparently another hospital employee), that whenever a black patient came to the patient representative office, Powerski would "find reasons not to assist them." On August 24, 2012, when she was leaving work at the end of the day, the plaintiff informed Powerski that she was going to "contact[] the Michigan Department of Civil Rights regarding the racial discrimination perpetrated on Plaintiff and patients, as well as the harassment and retaliation Plaintiff experienced in the workplace."

Earlier on August 24, 2012, Powerski had delivered a memo to the plaintiff stating that she was being investigated for accessing patient records without authorization, contrary to the hospital's HIPPA policy, and that the consequences could include termination. Powerski's report of the investigation states that she became aware of possible improper record accesses by the plaintiff when she received an email from Belle Bell, the hospital's privacy officer, involving six patients. Along with her department head, Theresa Bourque, Powerski reviewed the information in the EPIC and MIDAS systems and determined that for only two out of six of the patients in question, there was a record of a patient complaint in MIDAS. Powerski arranged a meeting to discuss the other four record accesses with the plaintiff, along with an earlier access to the medical records of the plaintiff's cousin on July 20, 2012. Powerski reported that the plaintiff stated she had handwritten notes relating to three out of the four patients in question, but she wrote that, as of August 30, 2012, the plaintiff had not provided those notes to her.

Powerski concluded in the "findings of investigation" section of her report that the plaintiff had not explained adequately why she accessed the medical records of her cousin, because the plaintiff told Powerski she received a complaint about her cousin's medical care after 3:00 p.m., but

the EPIC report showed that the plaintiff had accessed the records shortly after noon, and again around 2:30 p.m. Powerski further concluded that there was no corroboration in any other medical records for one of the alleged complaints of excessive wait time and a "rude nurse" that the plaintiff said she investigated. Powerski concluded by writing: "I am substantiating that a violation of HIPPA policy and work rule #33 of [the] Hurley Medical Center Employee Conduct Rules occurred."

The plaintiff insists that she never accessed any patient medical records for an improper purpose. She testified that, on July 20, 2012, she accessed the records of her cousin because she received a phone call around 11:30 a.m. from the cousin's brother asking Larry to "check up on" her cousin, "because of how [the hospital] treated her last time." The plaintiff testified that she did not tell Powerski that her cousin's case was made known to her after 3:00 p.m., and that the statement in Powerski's report to that effect was false. As to the records of the other four patients that Powerski asked her about, the plaintiff contends that she had accessed their records during her informal investigations of their complaints, and she had handwritten notes on several of them.

Hospital Privacy Officer Bell testified that she never provided Powerski with any statement that she had "substantiated a HIPPA violation" by the plaintiff. Instead, she merely informed Powerski that the EPIC audit report indicated that a possible violation may have occurred, but Powerski would have to investigate and reach her own conclusion, after reviewing the audit report and talking to the employee and patient involved. Bell also testified that she had concerns about the accuracy of the audit trails produced by the EPIC system, and she had run reports on her own activity in the system that turned out to be inaccurate.

-6-

Bell also testified that she had reviewed the EPIC audit report of accesses to several patient records that Powerski had confronted the plaintiff with at the August 24, 2012 meeting. Bell said that after reviewing the audit report, she had questions about whether it was accurate, and she had never substantiated any violation based on that report. Bell also testified that she examined a "Census Audit" that allegedly was produced by the plaintiff from the EPIC system. She asked several other people familiar with the EPIC system whether the plaintiff could have produced such a report with the level of access she was allowed in the system, and after some attempts to produce such a report with the plaintiff's credentials, it was determined that it could not be done. Bell could not substantiate any HIPPA violation that had occurred based on the "Census Audit" report.

Former hospital Human Resource Director Rebecca Jackson testified that it was the policy and practice of the hospital to have all suspected HIPPA policy violations substantiated by the hospital's privacy officer before terminating an employee, that she personally knew of several occasions when Ms. Bell had substantiated such violations before other employees were terminated, and that "if the Privacy Officer — Belle Bell — felt uncomfortable with the facts or circumstances surrounding the potential HIPPA violation or could not substantiate the HIPPA violation, Hurley Medical Center's Human Resource Department would not recommend the discharge of the employee."

On August 30, 2012, the plaintiff was given a notice that she was suspended pending termination, which was signed by Powerski and then head of the patient representative department, Theresa Bourque. The notice stated that the plaintiff was suspended for violating "Work Rule #33," based on an investigation that concluded she had accessed patient records without authorization, in violation of the hospital's HIPPA policy. On September 21, 2012, hospital Human Resources

Administrator David N. Szczepanski sent a notice to the plaintiff stating that her "suspension pending permission to terminate" was converted to a termination.

The hospital's employee grievance process allowed the plaintiff to pursue a grievance regarding the decisions to suspend and terminate her by: (1) discussing her objections with her immediate supervisor (in this case, Powerski); (2) discussing and reviewing the decisions with the head of her department; (3) further discussing and reviewing the decisions with the Vice President of Human Resources; and (4) finally, filing an appeal to the Civil Service Commission.  The defendant concedes that the fourth step was not available in August or September 2012, because the City of Flint Civil Service Commission had been disbanded by the City's Emergency Manager in December 2011.  However, the hospital points to a memorandum of understanding between the hospital and the local union that provided for binding arbitration as an alternative external process for reviewing employee grievances, after the Civil Service Commission was eliminated.

On September 25, 2012, four days after she was terminated, the plaintiff filed a complaint in the Genesee County, Michigan circuit court raising claims for (1) breach of her employment contract, because there was no good cause to fire her; (2) violating the Michigan Whistleblower Protection Act; and (3) retaliatory discharge, contrary to Michigan's Elliott-Larsen Civil Rights Act. The hospital was the only defendant named in that lawsuit.  After a jury trial in June 2014, a verdict was returned in favor the plaintiff and against the hospital on her breach of contract claim, awarding her back and future pay in excess of $180,000.  The jury found for the hospital on the Whistleblower and retaliation claims.  Defendant Powerski was not named in the state court lawsuit in any capacity.

Larry filed her four-count complaint in this Court against Powerski on October 29, 2014. The complaint raises claims for (1) tortious interference with contractual relations (count I); (2)

-8-

injurious falsehood (count II); (3) denial of procedural due process via 42 U.S.C. § 1983 (count III); and (4) first amendment harassment (count IV). Discovery closed on July 31, 2015, and the parties filed their dispositive motions. The Court heard oral argument on October 14, 2015.

II.

The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The defendant contends that all the counts of the plaintiff's complaint are barred by the doctrine of claim preclusion, also known as *res judicata*. The facts supporting that argument are largely undisputed. Where the material facts are mostly settled, and the question before the court is purely a legal one, the summary judgment procedure is well suited for resolution of the case. *See Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 435 (6th Cir. 2009).

A.

Powerski contends that all of the elements for the application of *res judicata* are satisfied as to each of the plaintiff's claims, because it is undisputed that the prior state court wrongful termination lawsuit resulted in a decision on the merits, all of the claims in the present complaint arise from the same "transaction" or operative facts, and the requirement of privity is satisfied by the employer-employee relationship, where the individual defendant in the second action was the plaintiff's supervisor who allegedly wrongfully recommended her termination, and the defendant in the previous wrongful termination lawsuit was the plaintiff's employer.  The plaintiff counters that the defendant's *res judicata* defense is foreclosed because it essentially would operate to impose on plaintiffs a rule of compulsory joinder of all possible defendants in a wrongful termination lawsuit, which is not required in state court proceedings by the Michigan Court Rules.

The doctrine of *res judicata* incorporates the idea that a party should have but one chance to prosecute a civil claim in a court.  It discourages multiple lawsuits directed toward the same alleged wrong.  *See Washington v. Sinai Hosp of Greater Detroit*, 478 Mich. 412, 418; 733 N.W.2d 755, 759 (2007).  As one court explained:

> Where a plaintiff has sued parties in serial litigation over the same transaction; where plaintiff chose the original forum and had the opportunity to raise all its claims relating to the disputed transaction in the first action; where there was a "special relationship" between the defendants in each action, if not complete identity of parties; and where although the prior action was concluded, the plaintiff's later suit continued to seek essentially similar relief — the courts have denied the plaintiff a second bite at the apple.

*Lubrizol Corp. v. Exxon Corp.*, 871 F.2d 1279, 1288 (5th Cir. 1989).  Michigan courts have explained that this "second bite" rule is intended to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage

-10-

reliance on adjudication." *Hackley v. Hackley*, 426 Mich. 582, 584, 395 N.W.2d 906, 907 (1986) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).

The doctrine embraces two separate concepts — claim preclusion and issue preclusion. "Claim preclusion, or true res judicata, refers to [the] effect of a prior judgment in foreclosing a subsequent claim that has never been litigated, because of a determination that it should have been advanced in an earlier action. Issue preclusion, [also called collateral estoppel,] on the other hand, refers to the foreclosure of an issue previously litigated." *Mitchell v. Chapman*, 343 F.3d 811, 819 n.5 (6th Cir. 2003). "The *res judicata* effect of a state-court judgment in federal court is governed by the Full Faith and Credit Act, 28 U.S.C. § 1738." *Young v. Township of Green Oak*, 471 F.3d 674, 680 (6th Cir. 2006) (citing *Smith, Hinchman & Grylls, Assocs. Inc. v. Tassic*, 990 F.2d 256, 257 (6th Cir. 1993) (concluding that the Full Faith and Credit Act requires a "federal court to look to state court law of *res judicata*")). That statute generally requires "federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Haring v. Prosise*, 462 U.S. 306, 313 (1983) (quoting *Allen*, 449 U.S. at 96); *see also Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984) ("It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.").

Application of section 1783 requires reference to the state's laws of claim preclusion and issue preclusion (although the Michigan Supreme Court "generally uses the terms 'res judicata' and 'collateral estoppel' rather than the phrases 'claim preclusion' and 'issue preclusion.'" *J.A.M. Corp. v. AARO Disposal, Inc.*, 461 Mich. 161, 168 n.7, 600 N.W.2d 617, 620 n.7 (1999)). Under Michigan claim preclusion law, "[a] second action is barred when (1) the first action was decided on the

-11-

merits, (2) the matter contested in the second action was or could have been resolved in the first, and (3) both actions involve the same parties or their privies." *Dart v. Dart*, 460 Mich. 573, 586, 597 N.W.2d 82, 88 (1999); *see also Smith*, 990 F.2d at 257-58; *Adair v. State*, 470 Mich. 105, 121, 680 N.W.2d 386, 396 (2004)). "If the three elements are established, then *res judicata* serves to bar 'every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not.'" *Young*, 471 F.3d at 680 (quoting *Adair*, 470 Mich. at 121, 680 N.W.2d at 396).

1.

a.

It is undisputed that Larry's state court wrongful termination action resulted in a decision on the merits when, after a jury trial, she received a verdict in her favor and an award of damages for more than $180,000. The first element of the test is satisfied.

b.

The plaintiff argues that the third element cannot be met because the defendants in the two lawsuits are not the same. But "[t]he parties to the second action need be only substantially identical to the parties in the first action, in that the rule applies to both parties and their privies." *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 12, 672 N.W.2d 351, 359 (2003). "Regarding private parties, a privy includes a person so identified in interest with another that he represents the same legal right, such as a principal to an agent, a master to a servant, or an indemnitor to an indemnitee." *Id.* at 12-13, 672 N.W.2d at 359. "In order to find privity between a party and a nonparty, Michigan courts require 'both a substantial identity of interests and a working or functional relationship in which the interests of the non-party are presented and protected by the

-12-

party in the litigation.'" *Ibid.* (quoting *Phinisee v. Rogers*, 229 Mich. App. 547, 553-54, 582 N.W.2d 852, 854 (1998)). "This test is met when the previous governmental-unit Defendant [] and the present-case [individually named defendants] have an employer-employee relationship, regardless of whether the claims in the first suit were brought against the Defendants in the same capacity as the claims in the second." *McCoy v. Michigan*, 369 F. App'x 646, 650 (6th Cir. 2010).

In this case, the former and present defendants are in privity because, as the hospital's employee and the plaintiff's former supervisor, Powerski qualifies as "a person so identified in interest with another that [s]he represents the same legal right, such as a principal to an agent [or] a master to a servant." *Peterson*, 259 Mich. App. at 12-13, 672 N.W.2d at 359. The plaintiff argues that there can be no privity because, even if she had joined Powerski in the state court action, Powerski would have been sued only in her official capacity. However, the Sixth Circuit expressly has held that privity is established "when the previous governmental-unit Defendant [] and the present-case [individually named defendants] have an employer-employee relationship, regardless of whether the claims in the first suit were brought against the Defendants in the same capacity as the claims in the second." *McCoy*, 369 F. App'x at 650; *see also De Polo v. Greig*, 338 Mich. 703, 710, 62 N.W.2d 441, 444 (1954) ("[A] determination of the issue in a suit brought against the principal bars an action against the agents."); *Brown v. Burch, Porter & Johnson PLLC Law Firm*, No. 15-2167, 2015 WL 5737802, at *6 (W.D. Tenn. Sept. 30, 2015) ("[The Board of Education] was the defendant in *Brown 1*, and is in privity with the [Board] employee Defendants in this case."); *LG Sciences, LLC v. Putz*, No. 11-10830, 2012 WL 1094336, at *5 (E.D. Mich. Mar. 30, 2012), *aff'd*, 511 F. App'x 516 (6th Cir. 2013) ("The test for privity among the parties is met when the parties stand in an employer-employee relationship."); *Coatney v. City of Dearborn*, No. 07-15371, 2009

WL 322032, at *3 (E.D. Mich. Feb. 10, 2009) ("The individual defendants in the present matter were not parties to the prior action; however, as employees of Defendant City of Dearborn, they are in privity with the City of Dearborn."). The third element has been satisfied.

*Mitchell v. Chapman*, 343 F.3d 811, 825 (6th Cir. 2003), relied upon by the plaintiff, does not require a different result. That case applied principles of federal claim preclusion law exclusively to federal claims brought first against a defendant agency and its employees in their official capacity and later against the employees only in their individual capacities. Here, it is Michigan's version of the doctrine that governs. *Young*, 471 F.3d at 682 ("The *res judicata* effect of a state-court judgment in federal court is governed by the Full Faith and Credit Act, 28 U.S.C. § 1738," and "[w]ell-settled law directs federal courts to 'give to a state court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.'" (quoting *Migra.*, 465 U.S. at 81)). Moreover, although the plaintiff insists that *Mitchell* prevents the application of *res judicata* to her individual claims against Powerski, the "rule of differing capacities" set forth in *Mitchell* does not apply where the defendant was not named in any capacity in the first lawsuit. The question at hand is not in what capacity the defendant was and is sued (or, hypothetically would or could have been sued), but, instead, whether the defendant and her employer stand in privity, whether the presently and previously asserted "[c]auses of action share an identity [because] the facts and events creating the right of action and the evidence necessary to sustain each claim are the same," *Heike*, 573 F. App'x at 483, and whether the present claims are ones "arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not" in the previous lawsuit. *Young*, 471 F.3d at 682.

-14-

c.

As to the second element — that the claims were or could have been brought in the previous action — the Sixth Circuit has held that claims sounding in denial of procedural due process and other theories premised upon an allegedly wrongful termination are barred by a previous state court lawsuit on a breach of contract or wrongful termination theory, where both lawsuits are premised on the same operative facts.  In *Huntsman v. Perry Local Sch. Bd. of Educ.*, 379 F. App'x 456, 462 (6th Cir. 2010), the Sixth Circuit held that a subsequent due process lawsuit was barred by the judgment in a previous state-court wrongful termination case, notwithstanding that the plaintiff only had pleaded state law claims in his prior complaint:

> The state law wrongful discharge claim is nearly identical to the federal procedural due process claims Huntsman sought to bring in the instant case  Admittedly, Huntsman referenced only state law in his state complaint, but the federal claim is essentially the same and could have been brought using the same language.  The federal procedural due process claim includes a two-prong analysis: (1) whether Huntsman has a protected interest in his employment as a teacher and (2) whether he was afforded the process he was due, which typically would require notice and a pre-termination hearing.  Huntsman's pleading in state court would likely have been sufficient for his federal claim simply by incorporating a reference to federal law. Therefore, the district court properly applied the doctrine of *res judicata* in dismissing the complaint.

*Huntsman*, 379 F. App'x at 462 (citations omitted).  As the court of appeals explained, "[e]ven if there may have been a colorable claim for nominal damages related to the lack of a hearing in Huntsman's federal procedural-due-process lawsuit, that claim should have been part of the state-court litigation."  *Id.* at 463.

The gravamen of Larry's tortious interference and injurious falsehood claims in counts I and II is that the defendant lied in order to procure unlawfully the plaintiff's termination by the hospital, which, as the state court verdict now has established, was a wrongful breach of the plaintiff's

-15-

employment contract.  The plaintiff contends that Powerski (1) fabricated charges that the plaintiff improperly accessed patient medical records in violation of the hospital's HIPPA policy; (2) falsely said that the plaintiff "made a gun shooting motion [with her hand] toward [the defendant]" during the course of the investigation; (3) refused to consider witnesses and information favorable to the plaintiff's position during the record-access investigation, despite the fact that hospital policy required a full and fair consideration of the plaintiff's position; and (3) refused to consider or impose any progressive discipline, as was required by the hospital's employee handbook.  The plaintiff contends that, by fabricating the record-access charges and recommending the plaintiff's termination without allowing her any opportunity to mount a substantive defense to the charges against her, the defendant tortiously interfered with the plaintiff's contractual relationship with the hospital, causing the hospital to breach that agreement by terminating her without good cause.  All of the factual premises of those claims were explored fully in, and central to the resolution of, the plaintiff's wrongful termination claim in the state court lawsuit.

In count III of her complaint, the plaintiff alleges that the defendant violated her procedural due process rights guaranteed by the Fourteenth Amendment and 42 U.S.C. § 1983 by (1) suspending her pending termination after a single summary pre-termination meeting, during which the plaintiff was not given any chance to mount a substantive defense to the charges of improper record access; and (2) failing or refusing to allow the plaintiff any opportunity for a thorough post-termination review of the decision to fire her.  Those factual premises likewise were at the heart of the plaintiff's state court lawsuit and fully were explored in the prior action.

But for the legal theories on which the plaintiff's present complaint is framed, the claims raised in counts I, II, and III are substantively indistinguishable from those that the plaintiff raised

-16-

— and on which she prevailed in part — in her state court wrongful termination case. *See Heike v. Cent. Michigan Univ. Bd. of Trustees*, 573 F. App'x 476, 483 (6th Cir. 2014) ("Causes of action share an identity where the facts and events creating the right of action and the evidence necessary to sustain each claim are the same."). The plaintiff previously raised, fully litigated, and recovered an award of damages on her claims that the hospital wrongfully terminated her contract of employment based on Powerski's false and improper termination recommendation. She now seeks to recover separately against Powerski individually for the same underlying wrongful conduct and the same ensuing harm, merely by fashioning her claims under different legal theories. Under the doctrine of claim preclusion as it has been applied by Michigan courts, such a "second bite at the apple" is precluded, because the present claims are ones "'arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not'" in the previous lawsuit. *Young*, 471 F.3d at 682 (quoting *Adair*, 470 Mich. at 121, 680 N.W.2d at 396).

In support of her argument that *res judicata* does not apply, the plaintiff relies principally on *Bennett v. Mackinac Bridge Auth.*, 289 Mich. App. 616, 630, 808 N.W.2d 471, 480 (2010), *East Muskegon Roofing & Sheet Metal Co. v. Holwerda*, No. 256591, 2006 WL 355208 (Mich. Ct. App. Feb. 16, 2006), and *Hoogland v. Kubatzke*, No. 307459, 2013 WL 331580 (Mich. Ct. App. Jan. 29, 2013). The plaintiff reasons that these cases tie the doctrine of claim preclusion to the concept of compulsory joinder; and since the Michigan court rules would not compel the plaintiff to join all her claims against Powerski in her prior lawsuit, claim preclusion cannot bar those claims here. That reasoning is unsound. Although the rules of claim preclusion and compulsory joinder are perhaps related and serve similar interests, they remain distinct and free-standing concepts. Compulsory joinder addresses those claims and parties that a plaintiff *must* join in a single action going forward.

-17-

Claim preclusion deals with the effect of a judgment in a concluded action on those parties and claims that the plaintiff *could have* brought or joined, but chose not to do so. *See Federated Dep't Stores, Inc., v. Moitie*, 452 U.S. 394, 398 (1981). Neither rule preempts the other, and the cases cited by the plaintiff do not suggest otherwise.

Moreover, *Bennett* and *Holwerda* are distinguishable because they involved the application of *res judicata* to claims brought under specific statutory language that allowed the plaintiffs to pursue separate actions against various parties. In *Bennett*, the court concluded that the Workers' Disability Compensation Act expressly permitted the plaintiff to proceed against either his direct or statutory employer, or both, and the Act did not require joinder of parties in a single proceeding. In *Holwerda*, the court concluded that the gravamen of the claims was not the same, because the liability of the individual corporate officer defendants under the Michigan Builders' Trust Fund Act was never at issue in the prior breach of contract lawsuit against the contracting company that those defendants had controlled. The statutes controlling those two cases do not map onto the circumstances present in this case.

*Hoogland* contains language that might be read to support the plaintiff's argument, *see Hoogland*, 2013 WL 331580 at \*4 (citing *Bennett* and stating, "As *res judicata* should not be used to punish a party from suing various defendants in different proceedings, plaintiff's claim should not be barred by *res judicata*."). But the case is distinguishable because Hoogland's earlier lawsuit was dismissed solely on the basis of a shortened statute of limitations that contractually applied to the employer, but did not benefit the individual administrator defendants in the second lawsuit. And its rationale depends mainly on the panel's reading of *Bennett*, which, as noted above, is premised on a specific statutory authorization of multiple lawsuits against different parties. No such statute

-18-

applied in *Hoogland*, which can best be read as promoting the idea that *res judicata* should not be used as a device to expand contractually-created defenses to benefit those who are not parties to the contract. A broader reading would render the case an outlier, to be disregarded as an unpublished and non-controlling decision, which is contrary to the Sixth Circuit's decision in *McCoy*, the weight of authority generally on point noted above, and the Sixth Circuit's published and controlling decision applying Michigan's principles of *res judicata* in *Young v. Township of Green Oak*, 471 F.3d 674, 682 (6th Cir. 2006) ("All of Young's employment discrimination and retaliation claims arise from the Township's refusal to return him to work. We thus conclude that the district court properly found that *res judicata* barred the relitigation of these claims.").

2.

The plaintiff's First Amendment retaliation claim stands on different footings, however. Unlike her other claims, the plaintiff's First Amendment retaliatory harassment claim is not barred by the *res judicata* effect of her state court wrongful termination lawsuit, because the substance of the harassment claim concerns a series of allegedly harassing actions that commenced as early as May 2012, almost all of which are distinguishable from and unrelated to the August 2012 record-access investigation and the ensuing decision to terminate the plaintiff that was made in September 2012. The plaintiff's claims of retaliatory harassment were not necessarily resolved by the state court judgment on her wrongful termination claim, nor could they have been, because the plaintiff there pursued and recovered damages solely for Powerski's and the hospital's conduct in terminating her, not for the months of alleged harassment by Powerski that preceded the termination.

The plaintiff's claim in the state court lawsuit against the hospital was for wrongful termination of her employment contract without good cause, and, in the context of the wrongful

-19-

termination lawsuit, the plaintiff could not have recovered against the hospital itself on any legal theory for Powerski's individual harassing conduct that had no temporal or transactional relationship to the termination itself.

Moreover, the substance of the plaintiff's retaliatory harassment allegations present entirely free-standing claims for relief that would be actionable against Powerski individually even if the hospital never had acted on Powerski's termination recommendation. *See McCoy*, 369 F. App'x at 651 ("[A]lthough the state-court litigation and the instant case both involve claims of discrimination and retaliation, they neither resulted from nor are they tied to the same MDOC actions. The gravamen of McCoy's federal complaint is that his 2004 termination and the activities and complaints surrounding that termination, which took place from June 2004 onward, are, despite everything that may have occurred previously, themselves actionable. In essence, the origin of the two claims is simply not the same.").

### B.

The defendant also attacks the plaintiff's First Amendment retaliation claim on the merits, arguing that the plaintiff cannot establish that she was engaged in any protected activity when she made her discrimination complaints, because when she voiced those complaints she was speaking solely as an employee and "pursuant to her official duties," citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). The defendant also maintains that none of the allegedly "harassing" conduct resulted in any consequences to the plaintiff's employment situation, and she therefore has failed to show that anything the defendant did amounted to an adverse action or caused her termination, which was based solely on the results of the record access violation, not the earlier allegedly

unjustified negative performance reviews and counseling memos entered into the plaintiff's personnel file.

The plaintiff styled count IV of her complaint as one for "First Amendment harassment," which is a particularized form of First Amendment retaliation. The plaintiff alleges that the defendant retaliated by "harassing" her via an unrelenting campaign of unfair and unfounded scrutiny, including by repeatedly placing gratuitous negative memos in her employment file, after the plaintiff exercised her rights under the First Amendment by complaining about racial harassment and discrimination that she said she suffered at the defendant's hands.

"To succeed on a First Amendment retaliation claim, the following elements must be proven: '(1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct.'" *Paterek v. Vill. of Armada, Mich.*, 801 F.3d 630, 645 (6th Cir. 2015) (quoting *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 723 (6th Cir. 2010)). "It is well established that a government employer cannot 'condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Perry v. McGinnis*, 209 F.3d 597, 604 (6th Cir. 2000) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)). "As a logical consequence, retaliation by a government employer against an individual who exercises his First Amendment rights constitutes a First Amendment violation." *Ibid.* (citing *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994)). "This is the case even if the employee could have been terminated for any reason." *Ibid.* (citing *Rankin v. McPherson*, 483 U.S. 378, 383 (1987)).

Protected conduct — the first element of the claim — is in turn determined by another three-element test.  "Under the test, commonly called the *Pickering* test, the plaintiff must [establish that]: (1) the speech involved a matter of public concern, (2) the interest of the employee 'as a citizen, in commenting upon matters of public concern,' outweighs the employer's interest 'in promoting the efficiency of the public services it performs through its employees,' and (3) the speech was a substantial or motivating factor in the denial of the benefit that was sought."  *Perry*, 209 F.3d at 604 (quoting *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968)).

Complaints about racial discrimination plainly fall within the ambit of speech about matters of public concern.  "In [*Connick v. Myers*, 461 U.S. 138 (1983)], the Supreme Court clearly established that racial discrimination is inherently a matter of public concern."  *Perry*, 209 F.3d at 608 (citing *Connick*, 461 U.S. at 148 n.8).  "Furthermore, in *Givhan v. Western Line Consolidated School District*, 439 U.S. 410 (1979), the Supreme Court established that an employee's choice to communicate privately with an employer [regarding a charge of racial discrimination] does not strip the concern of its public nature."  *Ibid.*  That is true regardless of whether the plaintiff made the complaints publicly, or privately to authorities within the workplace.  *Ibid.*

The defendant contends that the plaintiff was not engaged in First Amendment protected activity because, when she made her discrimination complaints, the plaintiff was speaking solely as an employee and "pursuant to her official duties."  *Garcetti*, 547 U.S. at 421 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").  But that argument ignores the Supreme Court's subsequent narrowing of the holding in *Garcetti*, refocusing the question on "whether the speech at issue is itself ordinarily

-22-

within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, --- U.S. ---, ---, 134 S. Ct. 2369, 2379 (2014). The Court explained that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee — rather than citizen — speech." *Ibid.* It would be unusual (and contrary to the very core of the First Amendment) to conclude, as the defendant urges, that a public employee surrenders her First Amendment protections any time she complains of unlawful activity, no matter how invidious, merely because an employer has a workplace policy that encourages or requires employees to report such conduct.

Termination of a plaintiff's employment undeniably constitutes an adverse action. *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) ("Bryson suffered an adverse action because she was terminated at the conclusion of her leave period."). However, in this case the plaintiff does not premise her "harassment" claim on the termination, but instead on the defendant's allegedly retaliatory campaign of relentless scrutiny following the plaintiff's complaints of racial discrimination. "In order to determine whether actions of lesser severity merit being deemed 'adverse' for purposes of a retaliation claim, [the Sixth Circuit has adopted] the standard suggested by Judge Posner in *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982), that an adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999). "'[S]ince there is no justification for harassing people for exercising their constitutional rights, [the effect on freedom of speech] need not be great in order to be actionable.'" *Id.* at 397 (quoting *Bart*, 677 F.2d at 625).

The complained of actions here were sufficient to discourage a person of ordinary firmness from exercising her rights under the First Amendment, regardless of whether they resulted in

-23-

tangible consequences to the plaintiff's employment situation, and notwithstanding the fact that the negative memos ultimately were removed from the plaintiff's file. Moreover, the recommendation for termination in itself is sufficient to qualify as an adverse action in a First Amendment retaliatory harassment claim, even if the defendant was not the ultimate decision maker in the termination. *Haji v. Columbus City Schools*, No. 12-3520, 2015 WL 4385280, at *4 (6th Cir. July 16, 2015) ("[E]ven if we accept the Defendants' contention that Haji was not terminated until August, the June 5 recommendation to terminate was still an adverse employment action.").

That leaves the question of causation. The court of appeals explained recently that "[c]ausation is best addressed as a two part inquiry. First, we determine whether 'the adverse action was proximately caused by an individual defendant's acts,' and second, we consider whether 'the individual taking those acts was motivated . . . by a desire to punish [the plaintiff] for the exercise of a constitutional right.'" *Paterek*, 801 F.3d at 646 (quoting *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012)). "The true object of this inquiry is to determine whether the plaintiff has been retaliated against as a direct result of his or her protected speech." *Ibid.*

"[P]roximity in time between the protected activity and the adverse . . . action may constitute evidence of a causal connection," *Bryson*, 498 F.3d at 571. The Sixth Circuit has found that temporal proximity may give rise to an inference of causation with a lapse of as long as three months between the protected activity and termination. *Ibid.*; *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) ("[T]he temporal proximity of these events is significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying Singfield's burden of demonstrating a *prima facie* case.").

The temporal proximity of the protected activity and the alleged harassing conduct is sufficient in this case to give rise to an inference of causation that defeats summary judgment on this claim, because the plaintiff contends that the defendant's unfounded increased scrutiny of her and the repeated placement of counseling memos in her employment file began almost immediately following her complaints of racial discrimination in late May 2012 and continued through the following three months until the defendant finally recommended the plaintiff's termination in August 2012. That falls within the three-month window the Sixth Circuit has found sufficient on other occasions. *Bryson*, 498 F.3d at 571; *Singfield*, 389 F.3d at 563. The defendant has produced some evidence that the allegedly excessive and retaliatory scrutiny of the plaintiff was warranted. However, Powerski admitted that the counseling memos later were removed from the plaintiff's file after a meeting between Powerski, Larry, and the then head of the patient representative department, Michael Burnett. In light of that testimony and the state court jury's determination that there was no good cause basis for the eventual termination, the defendant's evidence certainly is not so overwhelming as to compel the conclusion that, when viewing the record "'in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for defendant.'" *Paterek*, 801 F.3d at 646 (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294-95 (6th Cir. 2012)).

The plaintiff has submitted enough evidence on all the elements of her First Amendment retaliation claim to defeat summary judgment.

## C.

The defendant pleaded as an affirmative defense that she "has qualified immunity from the claims asserted by the Plaintiffs [sic]." However, she did not argue — or even mention — the

question of qualified immunity in her own motion for summary judgment, or in her reply brief in support of that motion. Instead, she developed the qualified immunity defense only in her response to the plaintiff's motion for partial summary judgment, which solely addressed the plaintiff's procedural due process claim raised in count III of the complaint. It does not appear that the defendant intends to assert a qualified immunity defense to the First Amendment retaliation claim, or if she ever did so, that defense is considered abandoned. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) (observing that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived," and reiterating that "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones") (quotations and alterations omitted).

III.

The plaintiff's claims based on tortious interference with contractual relations, injurious falsehood, and denial of procedural due process can proceed no further, because they are barred by the doctrine of claim preclusion, or *res judicata*. However, the plaintiff's claim for First Amendment retaliation is not so barred, and the plaintiff has brought forth sufficient facts to require a trial. The case management order, as amended, scheduled a final pretrial conference for December 16, 2015, which would require the parties to submit a proposed joint final pretrial order to chambers by December 9, 2015. Because this motion was decided within a week of the due date of the proposed final pretrial order, the Court will extend the time for its submission to **December 14, 2015**. *See* E.D. Mich. LR 16.1(f). The final pretrial conference and trial dates will remain the same.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt. #20] is **GRANTED IN PART AND DENIED IN PART**.

-26-

It is further **ORDERED** that the plaintiff's motion for partial summary judgment [dkt. #14] is **DENIED**.

It is further **ORDERED** that counts I, II, and III of the complaint are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the date for submission of the proposed joint final pretrial order to chambers is **EXTENDED** to **December 14, 2015**.  The final pretrial conference and trial dates will remain unchanged.

s/David M. Lawson                              
DAVID M. LAWSON
United States District Judge

Dated:   December 7, 2015

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 7, 2015.

s/Susan Pinkowski        
SUSAN PINKOWSKI

---